**Joseph M. GLISSON, Plaintiff,**

v.

**UNITED STATES FOREST SERVICE, et al., Defendants.**

**Civ. No. 92–4205–JLF.**

United States District Court, S.D. Illinois, · Benton Division.

Aug. 24, 1993.

**1020**

Joseph Glisson, pro se.

William E. Coonan, Asst. U.S. Atty., Fairview Heights, IL, Leslie M. Auriemmo, Atty., U.S. Dept. of Agriculture, Office of the Gen. Counsel, Milwaukee, WI, Randy Patchett, Winters, Brewster, Murphy, Crosby & Patchett, Marion, IL, for defendants.

## MEMORANDUM AND ORDER

FOREMAN, Senior District Judge:

This matter is before the Court on the parties' cross-motions for summary judgment (Document Nos. 20 and 23) and on the plaintiff's motion to strike and for sanctions (Document No. 28) and motion for a preliminary injunction (Document No. 30). The plaintiff's amended complaint raises issues under the Administrative Procedures Act (APA), 5 U.S.C. 701–706 (1988), the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370d (1988), and the National Forest Management Act (NFMA), 16 U.S.C. § 1604 (1988). Therefore, the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 (1988).

## I. BACKGROUND

This action centers on the United States Forest Service's decision to implement an ecological restoration program as part of its Amended Land and Resource Management Plan for the Shawnee National Forest (hereinafter referred to as the Amended Forest Plan). The plaintiff's lawsuit is aimed primarily at the Forest Service's approval of projects that implement the new ecological restoration program in an area of the forest known as Opportunity Area 6. However, the lawsuit necessarily raises several issues related to the agency's adoption of the ecological restoration program itself.

The Forest Service developed the ecological restoration program to restore the natural hardwood ecosystems that once existed in the region now encompassed by the Shawnee National Forest. Prior to early European settlement of the area in the early 1800s, the land was dominated by native hardwood trees and open glades or barrens communities. During the next century, brush and trees encroached upon the open barrens areas as a result of a significant reduction in the forest fires once used by Native Americans for hunting purposes. At the same time, the settlers removed some of the hardwood trees for farming. The land was farmed intensively "through the 1920's and 1930's when worn-out soil, erosion, drought,

and the Great Depression caused many farmers to abandon the land." Government Exhibit B2, Environmental Assessment for Opportunity Area 6 Ecological Restoration and Vegetation Management (hereinafter Environmental Assessment), at 1.

The federal government purchased the lands as part of the Shawnee National Forest during the 1930s, and the Forest Service and the Civilian Conservation Corps "began the first phase of restoring many of these old fields by planting pine trees to control erosion and revegetate the area." Id. Ecological restoration is "[t]he final phase of this reclamation, returning these pine plantations to native (presettlement) ecosystems...." Government Exhibit G2, Final Supplemental Environmental Impact Statement for the Amended Land and Resource Management Plan, at 4–105. Accordingly, the Forest Service has identified ecological restoration as one of the long-term management goals of its Amended Forest Plan. Government Exhibit G1, Amended Land and Resource Management Plan, at IV–3.

The plan provides that the Forest Service will eliminate some of the existing pine plantations and replace them with hardwoods. Id. at IV–3, IV–12; Government Exhibit G4, Record of Decision, at 15–16. The plan's forestwide guidelines establish certain areas as priorities for this restoration process. Government Exhibit G1, Amended Land and Resource Management Plan, at IV–12. In other areas, existing pine plantations will be allowed to naturally regenerate to a hardwood/pine mix. Id. Ultimately, the plan envisions that 89 percent of the forest will be hardwoods, 4.5 percent will be a hardwood/pine mix, and 4.9 percent will be openlands. Government Exhibit G2, Final Sup-

plemental Environmental Impact Statement for the Amended Land and Resource Management Plan, at 4–106. Currently, 77.5 percent of the forest is hardwoods, 15.8 percent is pine, and 5.1 percent is openlands; none of the land is considered mixed hardwood/pine. Id.

The Amended Forest Plan was adopted by Regional Forester Floyd Marita in 1992.[1] Government Exhibit G4, Record of Decision. The plaintiff filed a timely appeal, as did various other groups and individuals. The plaintiff also sought a stay of all "forest fragmenting activities" until the Chief of the Forest Service issued a decision on the appeal.

The Forest Service refused to grant the stay, finding that the request did not meet the requirements of 36 C.F.R. 217.10(d). Government Exhibit H2, at 1. Section 217.10(d) provides that in order to obtain a stay, the appellant must include specific reasons why a stay should be granted, including "[h]armful site-specific impacts or effects on the resources in the area affected by the activity(ies) to be stopped...." Thus, the Forest Service advised the plaintiff that he could not obtain a stay of all activities implementing the plan, but suggested instead that he "may wish to appeal decisions on specific projects or activities while we are reviewing your appeal of the Amended Forest Plan." Government Exhibit H2, at 2–3.

Within two months after the Amended Forest Plan was approved by the regional forester, the Forest Service issued its decision notice approving ecological restoration and vegetative management in Opportunity Area 6.[2] Government Exhibit B1, Decision Notice and Finding of No Significant Impact.

1. The Amended Forest Plan is an outgrowth of the Forest Service's 1986 Shawnee Forest Plan. Several appeals had been filed challenging the decision to adopt 1986 plan. In an attempt to informally resolve those appeals, the Forest Service entered into an agreement with those parties in 1988 to study and evaluate an amendment to the 1986 plan. The final decision to amend the plan was documented in a Record of Decision and Final Supplemental Environmental Impact Statement issued on March 23, 1992. On May 14, 1992, the decision was withdrawn and reissued, with a new decision date, to reflect a minor

change in the amended plan's guidelines for the Indiana and gray bats.

2. Section 219.10(e) of the Forest Service regulations provides that forest plans shall take effect upon approval. 36 C.F.R. § 219.19(e) (1992). Section 217.10(b) provides that "[r]equests to stay the approval of land and resource management plans ... shall not be granted. However, requests to stay implementation of a project or activity included in such a plan will be considered as provided for in [section 217.10(c)]." Id. § 271.10(b).

Based upon the Forest Service's environmental assessment, the agency found that the activities in Opportunity Area 6 would have no significant impact on the environment and, therefore, there was no need to do a more exhaustive environmental impact statement. *Id.*

The plaintiff pursued an administrative appeal of this decision and requested a stay of the decision pending the appeal. Government Exhibit F3. A stay was ultimately granted by the regional forester. Government Exhibit F9. However, upon review of the plaintiff's appeal, the forest supervisor and the regional forester ultimately affirmed the decision to proceed in Opportunity Area 6 and the stay was subsequently lifted. Government Exhibits F13 and F28.

In his pending lawsuit seeking judicial review of the decision, the plaintiff argues that the eradication of pine plantations in the Shawnee National Forest would violate the National Forest Management Act and the Forest Service's regulations implementing the NFMA because it would eliminate the viable populations of the pine warbler, which is a management indicator species for the forest. He further contends that the Forest Service violated the National Environmental Policy Act by failing to complete a full environmental impact statement before deciding to implement the ecological restoration program in Opportunity Area 6. Finally, the plaintiff argues that the Forest Service's denial of his request for a stay pending the appeal of the Amended Forest Plan was arbitrary and capricious.

As part of his lawsuit, the plaintiff filed a motion for a preliminary injunction to stay all forest fragmenting activities pending the Forest Service's decision on his appeal of the Amended Forest Plan. In addition to the request for a blanket stay, the plaintiff specifically requested that the Court stay certain pending timber sales in Opportunity Area 6. Based upon the government's assurances that projects in Opportunity Area 6 were still under an administrative stay while a separate appeal was pending, the Court denied the motion as moot with respect to that project area.[3] The plaintiff renewed the motion after the other appeal was decided and the Forest Service announced plans to move forward with some of the projects.

In the meantime, the Chief of the Forest Service ultimately affirmed the Amended Forest Plan. The decision, released on June 25, 1993, became the agency's final administrative determination when the Secretary of Agriculture declined to conduct a discretionary review pursuant to 36 C.F.R. §§ 217.7(e) and 217.17.

## II. ANALYSIS

### A. Motion for a Preliminary Injunction

■ The plaintiff's renewed motion for a preliminary injunction, like his original motion, seeks relief from the Forest Service's refusal to grant a blanket stay of all forest-fragmenting activities. The Court, however, finds that the denial of the stay was proper under section 217.10 of the Forest Service regulations.

Section 217.10(b) expressly states that "[r]equests to stay the approval of land and resource management plans prepared pursuant to 36 CFR part 219 shall not be granted. However, requests to stay implementation of a project or activity included in that plan will be considered as provided for in. [section 217.10(c)]." 36 C.F.R. § 217.10(b) (1992). Section 217.10(c) provides that the reviewing officer may consider granting a stay "[w]here a project or activity would be implemented before an appeal decision could be issued...." *Id.* § 217.10(c). Section 217.10(d) further states that to request a stay, an appellant must, *inter alia,*

> [p]rovide a written justification of the need for a stay, which at a minimum includes the following:
>
> (i) A description of the specific project(s), activity(ies), or action(s) to be stopped.

**3.** The plaintiff also had sought an injunction against a timber sale in the Whoopie Cat area. The Court denied the request and dismissed the plaintiff's claim concerning that sale, finding that the Forest Service had followed the proper procedures in making its decision to award the sale. *See* Document No. 17, Memorandum and Order (*October 23, 1992*).

(ii) Specific reasons why the stay should be granted in sufficient detail to permit the Reviewing Officer to evaluate and rule upon the stay request, including at a minimum:

(A) The specific adverse effect(s) upon the requester;

(B) Harmful site-specific impacts or effects on resources in the area affected by the activity(ies) to be stopped; and

(C) How the cited effects and impacts would prevent a meaningful decision on the merits.

*Id.* § 217.10(d)(3). Based upon these regulations, the agency correctly held that the plaintiff cannot get a blanket stay on implementation of the Amended Forest Plan; instead, he must request a stay on specific projects or activities.

The plaintiff's pending motion for a preliminary injunction does not identify any specific projects that he wants stayed. He has merely provided a copy of a newsletter in which the Forest Service describes "a mix of projects" that it intends to pursue to implement the Amended Forest Plan. Moreover, there is no indication in the record that the plaintiff has sought an administrative stay or otherwise exhausted his administrative rights with respect to any specific projects other than the ecological restoration program in Opportunity Area 6.

The plaintiff's request with respect to Opportunity Area 6 is properly before the Court.[4] However, because the Court has reached a decision on the merits of the plaintiff's claim regarding Opportunity Area 6, as set forth more fully in the following section, there is no need to consider whether a preliminary injunction should be issued. *See Cronin v. United States Dep't of Agric.,* 919 F.2d 439 (7th Cir.1990) (because the district court's function is merely to review the record compiled in an administrative proceeding, there generally is no interval between the preliminary and final consideration in the case and no need for a preliminary injunction). Accordingly, the plaintiff's motion for a preliminary injunction is **DENIED AS MOOT.**

**B. Cross–Motions for Summary Judgment**

The parties have filed cross-motions for summary judgment on the issues raised in the plaintiff's complaint. The plaintiff argues primarily that the decision to implement ecological restoration in the Amended Forest Plan and in Opportunity Area 6 is contrary to the National Forest Management Act and its implementing regulations. He further argues that the Forest Service violated the National Environmental Policy Act by failing to conduct a full-blown environmental impact statement before approving the Opportunity Area 6 projects.

The government argues, as a preliminary matter, that the plaintiff's claims are barred because he failed to exhaust his administrative remedies. On the merits of the plaintiff's claims, the government argues that the Forest Service's actions were proper under both NEPA and the NFMA.

Because this case involves judicial review of an agency's decision, the Court's resolution of this case is subject to a narrow standard. Under the Administrative Procedures Act, "[a]gency actions may be overturned only if they are—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right...." 5 U.S.C. § 706(2) (1988); *Sierra Club v. Robertson,* 810 F.Supp. 1021, 1025 (W.D.Ark. 1992). To determine whether agency action is arbitrary or capricious, the Court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989).

■ "It is generally accepted that federal agencies are entitled to a presumption of

---

4. The record indicates that the plaintiff exhausted his administrative remedies by requesting an administrative stay of the Opportunity Area 6 projects and administratively appealing the deni- al of that stay. Although the regional forester ultimately granted the request, the stay was lifted when the agency issued its final decision rejecting the plaintiff's appeal on the merits.

good faith and regularity in arriving at their decisions." *Citizens for Envtl. Quality v. United States,* 731 F.Supp. 970, 983 (D.Colo. 1989). However, this presumption is not irrebuttable. The courts must not "rubber stamp" agency decisions; instead, they must assure that the decisions comply with clear congressional mandates. *Sierra Club v. Espy,* 822 F.Supp. 356, 361 (E.D.Tex.1993); *Citizens for Envtl. Quality,* 731 F.Supp. at 983.

The Court will first discuss the government's exhaustion argument, and then turn to an analysis of the substantive issues.

### 1. *Failure to Exhaust Administrative Remedies*

The government argues that the plaintiff's lawsuit is barred because he has failed to exhaust his administrative remedies with respect to the Opportunity Area 6 decision. The Court acknowledges that under well-established administrative law, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Sierra Club v. Robertson,* 784 F.Supp. 593, 597 (W.D.Ark.1991). However, "[t]he Supreme Court ... has cautioned that the exhaustion doctrine is not to be applied blindly or inflexibly." *Id.* at 598. Thus, a district court must consider whether "the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *Id.* (quoting *West v. Bergland,* 611 F.2d 710, 715 (8th Cir.1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980)). Analysis of the government's interest requires the consideration of several factors including:

(1) whether allowing similarly situated litigants to bypass the administrative avenue would seriously impair the agency's ability to perform its function of developing facts and exercising discretion in the first instance; (2) whether allowing judicial review would encourage others to flout the administrative scheme designed by Congress; and (3) whether the circumstances require that the agency be given the first chance to correct its own errors, and to obviate, perhaps, the need for judicial review.

*Id.* In weighing the plaintiff's interest, "the court must consider the irreparable harm, if any, that will accrue to plaintiffs if the exhaustion doctrine is applied against them." *Id.,* 784 F.Supp. at 599.

■ The government first contends that the plaintiff failed to respond to the agency's scoping letter about the Opportunity Area 6 decision and, therefore, did not provide any input on the issue prior to the agency's issuance of a decision notice. However, the Government has provided no authority that would suggest that a plaintiff waives any right to appeal if he or she does not participate in the scoping process but does file a proper administrative appeal of the agency's decision.

Moreover, consideration of the factors set forth above weighs in favor of the plaintiff. As long as a plaintiff has filed an administrative appeal, the agency has an opportunity to perform its function of developing facts and exercising discretion in the first instance. Clearly it would be more efficient if the plaintiff were to voice his or her concerns before a decision is made. However, the failure to do so does not deprive the agency of the opportunity to correct its own errors as long as the plaintiff has properly pursued an administrative appeal.

■ The Government next argues that the plaintiff's notice of his administrative appeal of Opportunity Area 6 was too vague. In his statement of reasons for the appeal, the plaintiff first alleges that the decision notice is premature because it was issued less than a week after the Amended Forest Plan was revised and reissued. Government Exhibit F3, at 2. He then makes several arguments relating to the Forest Service's finding of no significant impact and failure to complete a full environmental impact statement. *Id.* His final two arguments allege that the ecological restoration program is merely a "subterfuge" to allow the Forest Service to continue to "below-cost" timber sales of pine under the disguise of ecological restoration and that the Amended Forest Plan "has been written to allow for virtually any project a

given [Forest Service] employee can imagine." *Id.* at 3. Then, in a summary paragraph, the plaintiff states:

> This DN and FONSI clearly are a *SUBTERFUGE* designed to continue below-cost timber production for industry and avoid being held accountable for loss of tax-payer dollars. This DN and FONSI are in violation of 36 CFR 219.27(a)(5), 36 CFR 219.27(b)(1), 36 CFR 219.27(c)(1), 36 CFR 219.28(c)(2) and 36 CFR 219.27(g). The requirements at 36 CFR 219.27(g) alone are sufficient to warrant a full-blown EIS on the cumulative effects of the planned type conversion of the pine habitat and the planned hardwood timber sales in this same area.

*Id.* The notice states that "[a]ppellant requests the FS withdraw the 5/19/92 DN & FONSI and conduct a full-blown EIS, in accordance with NEPA and CEQ regulations, on the cumulative effects of this proposed project and the Hays–Bay timber sale." *Id.* at 4.

The Court agrees with the government that the plaintiff's notice of appeal did not sufficiently raise all of the issues that the plaintiff is now pursuing in this lawsuit. The Forest Service regulations require appellants to provide "sufficient narrative evidence and argument to show why the decision by the lower level officer should be changed or reversed." 36 C.F.R. § 217.9(a) (1992). At a minimum the notice should, *inter alia*,

>   (5) Identify specifically that portion of the decision or decision document to which the requester objects;
>   (6) State the reasons for objecting, including issues of fact, law, regulation, or policy, and if applicable, *specifically how the decision violates law, regulation, or policy....*

*Id.* § 217.9(b)(5), (6).

The Court finds that the plaintiff's notice of appeal is arguably adequate to raise his allegations relating to the National Environmental Policy Act. His statement of reasons does not expressly refer to any statute or regulation, but his arguments obviously raise the issue of whether the decision complies with NEPA's requirements. Unfortunately, his other objections are not so clearly identi-

fied. In some parts of his notice, he makes specific objections to the decision but does not tie these objections into a specific law or regulation. Conversely, in the last part of his notice, he alleges that the decision violates several federal regulations but does not explain how these regulations have been violated.

■ The Court recognizes that submissions of *pro se* parties are held to less stringent standards than those prepared by lawyers. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). However, the courts are not required to construct a party's legal arguments for him. *Small v. Endicott*, No. 92–2201, 1993 WL 217059, at *6 (7th Cir. June 22, 1993). Thus, in an administrative proceeding, the Forest Service might be obliged to make an extra effort to determine the applicable law where a notice of appeal sufficiently describes the appellant's objections but merely omits to cite to the applicable statute or regulation. However, the agency is not expected to research and construct legal arguments where an appellant merely asserts that an agency decision violates a laundry list of regulations but provides no explanation of how those regulations relate to the decision on appeal.

In this case, the Forest Service attempted to respond to all of the plaintiff's objections even though some were not clearly identified according to the standards discussed above. Having done so, the Forest Service was not deprived of its opportunity to develop facts and exercise discretion in the first instance; the agency still had the first chance to correct its own errors. Thus, any interest the government may have under the exhaustion analysis is outweighed by the plaintiff's interest in preventing the irreversible harvest of trees and destruction of pine habitat. The Court, therefore, finds that the plaintiff is not barred from raising any of the issues that the Forest Service specifically addressed in its decision on the plaintiff's appeal.

■ One issue that does not fall into this category is the plaintiff's main argument on appeal—i.e., that the ecological restoration program violates section 219.19 of the Forest Service regulations by failing to maintain

viable populations of the pine warbler, which is one of the forest's management indicator species. The plaintiff does not mention this argument at all in his narrative description of his objections to the Opportunity Area 6 decision. Nor did he mention section 219.19 in his laundry list of regulations that he asserts were violated by the decision. The Court, therefore, finds that the plaintiff is barred from raising the issue in the pending lawsuit. However, for the sake of completeness and efficiency, the Court discusses the substance of this argument below and finds, as an alternative holding, that the agency's decision is in compliance with the regulation.

### 2. *Compliance with the National Forest Management Act*

■ The plaintiff argues that the Amended Forest Plan and the decision notice for Opportunity Area 6 do not meet the minimum standards of the National Forest Management Act. More specifically, the plaintiff alleges that the Forest Service has not complied with the Forest Service regulations implementing the NFMA because implementation of the Amended Forest Plan will result in extirpation of the pine warbler, which was selected as a management indicator species for the Shawnee National Forest.

The plaintiff's main argument in his motion for summary judgment is that the Forest Service has violated section 219.19 of the regulations, which provides that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19 (1992); *see also id.* § 219.27(a)(6) ("All management prescriptions shall . . . [p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species and provide that habitat for species chosen under § 219.19 is maintained and improved to the degree consistent with multiple-use objectives established in the plan. . . ."). The plaintiff alleges that the ecological restoration component of the Amended Forest Plan violates this provision because it calls for the elimination of the pine plantations which, in turn, will cause the extirpation of the pine warbler and other species that depend upon mature, pure pine stands. This group of species is collectively referred to as the pine warbler guild.

The government acknowledges that under the Amended Forest Plan, the forest eventually will not sustain minimum viable populations of the pine warbler guild. However, the government argues that species in the pine warbler guild are not native to southern Illinois and are not desired in the Shawnee National Forest. Therefore, the government contends that the Forest Service is not required to maintain minimum viable populations of the pine warbler guild under section 219.19.

The plaintiff disputes the characterization of the pine warbler as a non-native species. In support of his argument, he has supplemented the record with a copy of a Forest Service document that identifies the management indicator species selected for the Shawnee National Forest. Document No. 41. In this document, the plaintiff has highlighted the repeated references to the selection of "native" plants and animals as management indicator species. Indeed, in explaining the methodology and criteria for selection of management indicator species, the document states that "[t]he first step is to determine which native vertebrates occur in the geographic region containing the planning area. . . ." *Id.* at 5. However, the plaintiff overlooks a subsequent paragraph which states that

> [f]or purposes of ensuring that habitat requirements of all native *and non-native* vertebrates were considered and for modeling, a list of management indicator species was selected to represent 4 distinct vegetative successional stages among 3 major forest timber types.
>
> Eight of these species will serve[ ] as "models" within FORPLAN to estimate the effects of management alternatives. . . .

*Id.* at 7–8 (emphasis added). Therefore, although the pine warbler was selected "as a management indicator species that represents a large group of canopy-dwelling foliage-gleaning species[,]" there is no indication in the report that the pine warbler was chosen because it is a native species rather

than a non-native species representative of species that utilize a particular part of the forest.

■ The plaintiff also has supplied the Court with a declaration from ornithologist Dr. Jean W. Graber, who "declare[s] unequivocally that the pine warbler is an ILLINOIS' NATIVE VERTEBRATE." Plaintiff's Exhibit Accompanying Memorandum in Support of the Motion for Summary Judgment (Document No. 21). The Court cannot consider this evidence because it is not part of the administrative record. *See Citizens for Envtl. Quality v. United States,* 731 F.Supp. 970, 982 (D.Colo.1989) ("The court must only consider whether the Forest Service made an erroneous decision based on the record before it."). However, Dr. Graber's declaration refers to a publication that was part of the administrative record. Jean W. Graber, Richard R. Graber, and Ethelyn L. Kirk, *Illinois Birds: Wood Warblers* (Illinois Natural History Survey, Champaign, Illinois), April 1983. Dr. Graber asserts that this article shows that "the Pine Warbler has been continuously documented in the state of Illinois from the earliest avian records which date back to the 19th century." However, this statement does not refute the Forest Service's determination that the Pine Warbler is not native to *southern* Illinois. In fact, the publication appears to support the Forest Service's position because it states that "[p]ine warblers have *adapted* as breeding birds to the extensive pine plantations of southern Illinois...." *Id.* at 78 (emphasis added). The article also contains an illustration of the general distribution of the pine warbler throughout the United States. *Id.* The illustration suggests that the bird's breeding range includes, at best, only a very minute portion of the southernmost tip of Illinois. The vast majority of the Shawnee National Forest is outside this range.

Finally, simple logic supports the agency's determination that the pine warbler became established in the Shawnee National Forest only after the non-native pines were planted in the 1930s. If the pine plantations themselves are not native to southern Illinois, then the species that depend upon mature pine stands cannot be native to the area

either. The plaintiff has not pointed to any parts of the administrative record to contradict this conclusion. Therefore, the Court cannot say that the Forest Service made a clear error of judgment in determining that the pine warbler is not a native species of southern Illinois.

■ Because members of the pine warbler guild are not native species, the Forest Service is not under an absolute requirement of maintaining a viable population of these species. However, because the pine warbler guild was selected as a management indicator species, section 219.19(a) provides that "[e]ach alternative shall establish objectives for the maintenance and improvement of habitat for management indicator species selected under paragraph (g)(1) of this section, *to the degree consistent with overall multiple use objectives of the alternative.*" 36 C.F.R. § 219.19(a) (1992) (emphasis added). The regulation goes on to require that the agency estimate the effects of proposed activities upon the management indicator species and *"[w]here appropriate,* measures to mitigate adverse effects shall be prescribed." *Id.* § 219.19(a)(1). In contrast, the regulation provides a more stringent requirement where threatened and endangered species are involved. "Habitat determined to be critical for threatened and endangered species shall be identified, and measures shall be prescribed to prevent the destruction or adverse modification of such habitat." *Id.* § 219.19(a)(7).

Reading these provisions as a whole, it is apparent that the Forest Service may take action that is adverse to a management indicator species—but not threatened and endangered species—so long as it is consistent with the overall multiple-use objectives of the forest plan. As the government points out, one of the multiple-use objectives of the Amended Forest Plan is to enhance and improve the biodiversity of the forest by eliminating the non-native pine plantations and restoring native hardwood forest. Maintaining viable populations of the pine warbler guild is obviously not consistent with this objective.

■ The plaintiff argues that the Opportunity Area 6 projects will have detrimental

effects upon other species. More specifically, the plaintiff points to the fact that the pine conversion program will affect 100 percent of the habitat for the golden mouse, which is categorized as a threatened species under state law. However, the plaintiff overlooks the fact that the alternative chosen by the Forest Service incorporates the Amended Forest Plan's guidelines and standards to limit the negative effects on golden mice. Government Exhibit B2, Environmental Assessment for Opportunity Area 6, at 195, 225; Government Exhibit B1, Decision Notice for Opportunity Area 6, at 7 (site-specific mitigation measures for golden mouse); Government Exhibit G1, Amended Forest Plan, at IV–65 (guidelines for golden mouse habitat).

Because of these mitigation measures, the environmental assessment concludes that there will be no short-term effects on the golden mouse. Government Exhibit B2, at 195–96, 225. Over the long term, there may be slight to moderate negative effects on potential golden mouse habitat as the mature hardwood develops. *Id.* However, the environmental assessment predicts that there will be no significant effect on the viability of golden mouse populations in Opportunity Area 6. *Id.* In summation, the environmental assessment found that there may be "slight negative effects on *potential* habitat as non-native pine and honeysuckle understories are reduced but no effects on present golden mice populations.... Viable populations of golden mice will be maintained in OA–6 where they presently occur in this Alternative." *Id.* at 197–98, 227 (emphasis added).

The plaintiff argues that pine conversion also will affect the Cooper's hawk, which is categorized as an endangered species by the state. The plaintiff points out that 87.5 percent of the Cooper's hawk's nests in the Shawnee are located in pine stands. Here again, however, the Amended Forest Plan provides for specific standards and guidelines to limit the negative effects on this species (Government Exhibit G1, at IV–61) and these guidelines have been incorporated into the Opportunity Area 6 decision. Government Exhibit B1, Decision Notice for Opportunity Area 6, at 6 (site-specific mitigation measures

for Cooper's Hawk). By following these guidelines, no known nesting sites will be disturbed. Government Exhibit B2, at 190. Moreover, although the environmental assessment predicts a short-term loss of *potential* nesting habitat for the Cooper's hawk, all lost potential habitat would be recovered in 20 to 50 years in mixed pine/hardwood areas. *Id.* at 189–90 (emphasis added). In short, the environmental assessment states that "[n]o effects on known populations of any of the above three hawk species are predicted [because] known sites will be protected. However, short term *expansion* of existing populations of Cooper's and sharp-shinned hawks maybe [sic] negatively effected" under the chosen alternative. *Id.* at 191 (emphasis added).

Based upon this discussion, the Court finds that the Forest Service has complied with section 219.19(a)(7)'s requirement that "[h]abitat determined to be critical for threatened and endangered species shall be identified, and measures shall be prescribed to prevent the destruction or adverse modification of such habitat." 36 C.F.R. § 219.19(a)(7).

■ The plaintiff next argues that elimination of the pine warbler guild will violate the biological diversity requirement in the Forest Service regulations. Section 219.26 of the regulations provides that "[f]orest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area." 36 C.F.R. § 219.26 (1992). Section 219.27(a) expands on this requirement by providing that all management prescriptions in forest plans shall "[p]rovide for and maintain diversity of plant and animal communities to meet overall multiple use objectives, as provided for in paragraph (g) of this section...." *Id.* § 219.27(a)(5). Section 219.27(g) provides that

[m]anagement prescriptions, where appropriate and to the extent practicable, shall preserve and enhance the diversity of plant and animal communities, including endemic and desirable naturalized plant and animals species, so that it is at least as great as that which would be expected in a

natural forest and the diversity of tree species similar to that existing in the planning area. Reductions in diversity of plant and animal communities and tree species from that which would be expected in a natural forest, or from that similar to the existing diversity in the planning area, may be prescribed only where needed to meet overall multiple-use objectives. Planned type conversion shall be justified by an analysis showing biological, economic, social, and environmental design consequences, and the relation of such conversions to the process of natural change. *Id.* § 219.27(g).

The government argues that the ecological restoration program will enhance and improve diversity in the forest. *See* Government Exhibit G4, Record of Decision, at 16 ("Alternative 5 was selected because it will improve the natural biological diversity of the Shawnee National Forest by converting many of the nonnative pine plantations to hardwood forests or other natural ecosystems."). Thus, the government contends the Amended Forest Plan is in compliance with the regulatory diversity requirements.

As prior court decisions and commentary suggest, diversity is an elusive concept under both the National Forest Management Act and the regulations implementing the act. *See Sierra Club v. Robertson,* 810 F.Supp. 1021, 1027 (W.D.Ark.1992); Charles F. Wilkinson and H. Michael Anderson, *Land and Resource Planning in the National Forests,* 64 Or.L.Rev.1, 296 (1985). The Act provides that the implementing regulations shall establish guidelines for the forest plans which

> provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan.

16 U.S.C. § 1604(g)(3)(B) (1988). Significantly, the Act does not define the term "diversity." Moreover, "the statutory lan-

guage is so qualified that 'it is difficult to discern any concrete legal standards on the fact of the provision.'" *Sierra Club v. Robertson,* 810 F.Supp. 1021, 1027 (W.D.Ark. 1992) (quoting Charles F. Wilkinson and H. Michael Anderson, *Land and Resource Planning in the National Forests,* 64 Or.L.Rev. 1, 296 (1985)).

The regulations define diversity as "[t]he distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 36 C.F.R. § 219.3 (1988). However, the regulations do not specify a particular formula or method of achieving diversity. In fact, the Committee on Scientists, which helped draft the regulations, stated that the diversity "was one of the most perplexing issues dealt within the draft regulations. We believe it is impossible to write specific regulations to 'provide for' diversity." 44 Fed.Reg. 26600–01. "Although the statement of policy [to provide for diversity] is clear, there remains a great deal of room for honest debate on the translation of policy into management planning requirements and into management programs." *Id.* at 26608.

■ In view of the ambiguity in the statute and the regulations, and because the issues require a high level of technical expertise, the Court must give considerable deference to the Forest Service's judgment. *Sierra Club v. Robertson,* 810 F.Supp. 1021, 1028 (W.D.Ark.1992); *see also Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976); *Sierra Club v. Espy,* 822 F.Supp. 356, 361 (E.D.Tex.1993) ("the United States Supreme Court has ruled that *ambiguous* statutes are to be deemed provisions of policy discretion (i.e., for the agency), rather than of purely legal interpretation (i.e., for the courts)—and are thus properly "deferred" by courts to agencies for (reasonable) policymaking."). Thus, the Court must examine the agency's definition of diversity and whether the Opportunity Area 6 decision comports with this definition.

The Forest Service, as part of the Final Supplemental Environmental Impact Statement for the Amended Forest Plan, defines

diversity in several different ways. Government Exhibit G2, Final Supplemental Environmental Impact Statement for the Amended Land and Resource Management Plan, at 4–100–101. The first is genetic diversity, which consists of the natural levels of genetic variation within and among a given species (i.e., the physical traits of a species, its productivity, resilience to stress, and long-term evolutionary potential). *Id.* at 4–100. The second is species diversity, which occurs when an area contains its native species in numbers and distributions that contribute to both natural genetic variation and the likelihood of long-term continued existence throughout their geographic ranges. *Id.* at 4–101. The third involves biological communities, or the associations of species in an area.[5] *Id.* The fourth involves the regional landscape, or "variety in the kinds of biological communities and a biogeography (patterns, sizes, shapes, juxtapositions and interconnectedness) that provides for free, natural interchange of individuals throughout the area." *Id.* at 4–101.

Based upon these definitions, the Forest Service found that "[t]he biological diversity inherent within the diversity of ecosystems present on the Shawnee will be maintained and/or enhanced through the implementation of the Forest Plan." *Id.* at 4–101. The FSEIS further explains that

The desired future condition of the Forest under alternative 5 [which ultimately became the Amended Forest Plan] foresees no pine regeneration at all. Ecological restoration will therefore result in noticeable improvements in native plant communities adjacent to pine plantations because the elimination of these exotic species (pines) will eliminate the growing problem of pine invasion into native plant communities, especially the high-quality natural areas.

When viewed at the regional landscape scale, with regard to ecological restoration, adopting any of the alternatives will im-

prove the biodiversity of the planning area. . . .

Improvement under alternative 5 will be moderate, at both the ecosystem and regional landscape scales, because pine will no longer have a major exotic-species impact on native ecosystems, and because pine plantations will no longer fragment the natural, deciduous-forest landscape of southern Illinois.

*Id.* at 4–105.

The Record of Decision similarly explains that Alternative 5 was chosen for biological diversity and wildlife habitat. The decision notes that the chosen alternative "prescribes restoration of remnants of the hill prairies, glades, and savannas that were once extensive throughout Southern Illinois [and] provides large blocks of old-growth hardwood forests to enhance habitat for the wildlife and plants that live in the innermost parts of the forest." Government Exhibit G4, Record of Decision, at 14. The decision further indicates that one of the other alternatives was not chosen because it does not provide for conversion of non-native pine plantations to hardwood or other natural hardwood ecosystems. *Id.* at 17.

This precludes the opportunity to restore natural ecosystems. In some areas of the Forest, there is a critical need to remove pines. Failure to eliminate pine plantations that are adjacent to natural areas where pine seedlings are invading into the natural plant communities, would significantly harm diversity of the Forest. This pine would continue to seed into natural areas, destroying native plant diversity.

*Id.* Finally, in discussing the timber to be harvested under the amended plan, the decision emphasizes that the forest must be managed for all resources, not solely or primarily timber. *Id.* at 20. "I believe alternative 5 provides the best possible mix of timber, recreation, wildlife, and other outputs and uses while protecting and enhancing the ba-

---

5. The FSEIS more fully describes this as "[t]he variety of species in an area, referred to as its species composition, is intertwined with the structure of the ecosystem, and hence the diversity of ecological processes such as competition, predation, succession, nutrient cycling, and mu-

tualism. Biologically diverse communities contain sufficient compositional, structural, and functional variety that they are assured a high prospect of continued presence and ecological influence in the area." Government Exhibit G2, at 4–101.

sic forest resources. Neither a greater or lesser timber harvest volume would provide the best mix of resource use and environmental protection." *Id.*

The Record of Decision makes it clear that the Forest Service was aware of the environmental effects of implementing the ecological restoration program. *See id.* at 16 ("In making this decision, I realize that implementing alternative 5 over the long-term (150+ years) will likely eliminate all of the Shawnee National Forest's habitat for the pine warbler and other species that require mature pine forests."). Thus, in choosing to implement the ecological restoration program, the Forest Service obviously weighed the environmental benefits of eliminating the pine plantations against the detriment of losing the species in the pine warbler guild. The decision, which took into consideration public comments favoring the conversion,[6] reflects the fact that the agency ultimately placed a greater importance on increasing the overall biological diversity of the forest than on maintaining the pine warbler guild. Accordingly, the Court finds that the ecological restoration program is in compliance with the diversity requirements of the regulations.

■ The plaintiff argues that one of the alternatives that the Forest Service rejected in amending the forest plan was environmentally more desirable because it would allow the pine stands to succeed naturally into a mixed pine and hardwood forest. This proposal, identified as alternative 4, provided no timber harvest for any purpose, no wildlife opening construction or maintenance, and no prescribed burning except for that needed to maintain rare ecosystems. However, contrary to the plaintiff's view, the Final Supplemental Environmental Impact Statement found that alternative 4 was less desirable than the chosen alternative, alternative 5. Government Exhibit G2, at 2–46, 2–47.

> Pine Warbler populations will decrease significantly in all alternatives due to the conversion of pine to hardwood. In Alternatives 1, 2, and 3, there is some reforestation and management to retain the required habitat of pure stands of pine that are over 40 years old. Populations are expected to drop in half in these alternatives. Alternatives 4 and 5 have no provisions to plant and manage pure pine stands. Although there will be some mixed pine/hardwood stands remaining on the Forest in the long-term due to natural succession of existing stands, these areas of mixed pine/hardwood will not provide suitable pine warbler habitat.

*Id.* at 2–47. Thus, the FSEIS shows that the pine warbler habitat would cease to exist under alternative 4 as well.[7] Moreover, although alternative 5 would result in some decreases in the populations of quail, yellow breasted chat, prairie warbler, and the great crested flycatcher, the FSEIS shows that even greater population declines would occur for these species and others under alternative 4. *See* chart, *id.* at 2–46.

■ The plaintiff contends that the Forest Service failed to justify its planned type conversion of pine plantations to hardwoods

**6.** As the government points out, public comments generally indicated a favorable response to the plan to reduce the non-native pine component and replace it with native plant communities. *See* Government Exhibit C–10, Letter from Thomas M. Groutage, Assistant Field Supervisor, U.S. Fish and Wildlife Service ("The reestablishment of native species is appropriate when, as you have proposed, the purposes of creating timber and wood products are meshed with maintaining and enhancing wildlife habitat."); Letter from Todd Fink, Illinois Department of Conservation, Division of Natural Heritage ("Although the pine stands function structurally as a forest and help to close the canopy, they also contribute to fragmentation of the hardwood component of the forest. Because this area has the makings of a macrosite (a large, unbroken tract of forest which can function as a viable ecosystem), the

Division of Natural Heritage would support and applaud the conversion of all pine stands to hardwoods and as a result would support any reasonable silvicultural means that would result in this conversion. Pine harvest here would also reduce the risk of pine invading the Natural Areas. We feel in the long run that this area would be even more viable as the forest ecosystem it was during presettlement times if it was converted back to hardwood forest.").

**7.** The plaintiff argues that it is purely speculative to conclude that the pine warbler populations would decline if the pine stands naturally succeed to a mixed pine/hardwood forest. However, he has presented no evidence from the administrative record to establish that the agency's determination is arbitrary or capricious.

by an analysis of the biological, economic, social, and environmental design consequences of the conversion, as required by section 219.27(g) of the regulations. 36 C.F.R. § 219.27(g) (1992). This argument is also without merit. The record shows that the Forest Service conducted a thorough environmental analysis in its Final Supplemental Environmental Impact Statement for the Final Amended Plan. *Id.* Although the FSEIS was completed pursuant to the requirements of the National Environmental Policy Act, its findings and conclusions also meet the requirements of section 219.27(g). Based upon this analysis, the Forest Service determined that the ecological restoration program would provide a long-term benefit to the forest that outweighed any detriments to the pine warbler guild. Accordingly, the agency sufficiently justified the type conversion from pine plantations to hardwoods.

■ The plaintiff's final argument relating to the National Forest Management Act is that the ecological restoration program fails to comply with section 219.27(c) of the implementing regulations. Section 219.27(c) sets forth certain requirements for timber harvest and silvicultural practices for the forest, providing that no timber harvesting shall occur on unsuitable lands "except for salvage sales, sales necessary to protect other multiple-use values or activities that meet other objectives on such lands if the forest plan establishes such actions are appropriate." 36 C.F.R. § 219.27(c)(1) (1992). The Forest Service acknowledges that Opportunity Area 6 pine sales are in areas classified as unsuitable for timber production, but argues that the ecological restoration program qualifies under the exception for sales necessary to

protect other multiple-use values. The Court agrees. As discussed earlier in this opinion, both the Amended Forest Plan and the Opportunity Area 6 decision call for harvesting the pine only for the purpose of eliminating the exotic pine species. Thus, the ecological restoration is allowed under section 219.27(c).

■ The plaintiff argues that the ecological restoration cuts are simply a subterfuge to circumvent the public's objections to below-cost timber sales. He argues that the ecological restoration cuts should be included in the Allowable Sale Quantity of the forest plan. The Government, however, argues that the Forest Service regulations, by definition, expressly exclude such projects from the ASQ. *See* 36 C.F.R. § 219.3 ("Allowable sale quantity: The quantity of timber that may be sold from the area of suitable land covered by the forest plan for a time period specified by the plan.").

The plaintiff's chief complaint appears to be that categorizing pine sales under the ecological restoration program will camouflage the fact that such sales are being subsidized by the government. In other words, these sales are not considered "below cost" timber sales because they are scheduled for purposes of wildlife management, as opposed to timber production.[8] However, this is merely a complaint about public relations— i.e., that the public is not informed about the true costs of this program. The argument has no relevance to the validity of the ecological restoration program under the National Forest Management Act or the Forest Service regulations. As demonstrated by the Court's discussion above, the Forest Service has fully complied with the applicable law in

8. To some extent, this is true. The Final Supplemental Environmental Impact Statement contains two charts and explanatory text that describe how the timber sale program will have a net gain—as opposed to a net loss—under the chosen alternative because it targets only the cost-effective hardwoods for actual timber production purposes. Government Exhibit G2, at 2–58. The pine harvests are not included in the timber production projections. The Forest Service acknowledges that some below-cost pine sales will be used to regenerate the non-native pine to hardwoods and for other similar purposes. *Id.* at 2–59. However, the FSEIS does not identify the exact cost of the ecological resto-

ration program. It merely states that the Forest Service assumed that its total budget for the Shawnee National Forest would remain the same under any of the proposed alternatives

because we assumed that budget decreases in one area would be made up by increases in other areas as needed to reflect the emphasis for each alternative. For example, money that would be otherwise be spent on timber sale preparation and administration would be shifted into other programs such as land acquisition, soil and water restoration, recreation and wildlife.

*Id.* at 2–57.

developing the ecological restoration program. How it pays for the program is a budgetary matter between the agency and Congress.

### 3. Compliance with the National Environmental Policy Act

■ The plaintiff argues that the Opportunity Area 6 decision violates the National Environmental Policy Act because the Forest Service refused to conduct a full-blown environmental impact statement. However the government argues that the environmental assessment on Opportunity Area 6 is sufficient because it is tiered to the Final Supplemental Environmental Impact Statement that was done in conjunction with the Amended Forest Plan. The Court agrees.

The Council on Environmental Quality regulations that implement NEPA expressly state that:

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review. Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.

40 C.F.R. § 1502.20; *see also id.* § 1508.28 ("[t]iering is appropriate when the sequence of statements or analyses is: (a) From a program, plan, or policy environmental impact statement ... to a site-specific statement of analysis."). Accordingly, the Seventh Circuit has held that once an environmental impact statement has been issued for a Forest Plan, the Forest Service generally is not required to prepare additional environmental impact statements for every site-specific project that is authorized under the Plan. *Cronin v. United States Dep't of Agric.,* 919 F.2d 439, 447–48 (7th Cir.1990).

■ Certain exceptions exist, such as where there are changed circumstances or new information. In those situations, the original environmental impact statement may not be adequate to assess the environmental impact of the new project and, therefore, a new statement must be prepared. *Id.* at 448. However, in this case, there is no showing that new circumstances or information have come to light. The Final Supplemental Environmental Impact Statement for the Amended Forest Plan fully recognized that the ecological restoration program authorized in the amended plan would eventually result in the eradication of the pine warbler population due to the elimination of the bird's habitat. The environmental assessment for Opportunity Area 6 concludes that the project would result in an 82 percent decline in the pine warbler habitat in that area. Obviously, this decline was envisioned in the environmental impact statement prepared for the overall plan amendment.

■ An agency's refusal to prepare an environmental impact statement is reviewed under the arbitrary and capricious standard. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Because the issue of ecological restoration was fully analyzed in the Final Supplemental Environmental Impact Statement for the Amended Forest Plan, the Court finds that the Forest Service did not act arbitrarily or capriciously by preparing an environmental assessment rather than a full environmental impact statement for Opportunity Area 6.

■ The arbitrary and capricious standard also applies to a court's review of an agency's decision to go forward with a project after completing the environmental analysis required under NEPA. "The role of the courts [reviewing agency decisions under NEPA] is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,* 462 U.S. at 87, 97–

98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983).

> Neither the statute [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.... The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken."

*Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976) (citations omitted).

Based upon a careful review of the administrative record, the Court finds that the Forest Service has sufficiently identified, disclosed, and considered the environmental consequences of going forward with the projects in Opportunity Area 6. For the reasons set forth in the Court's analysis above under the National Forest Management Act, the Court further finds that the ultimate decision was not arbitrary and capricious.

In sum, the Court finds that the Forest Service's decision to implement the ecological restoration program in Opportunity Area 6 fully complied with NEPA and with the NFMA and its implementing regulations. Accordingly, the Court hereby GRANTS the government's motion for summary judgment and **DENIES** the plaintiff's motion for summary judgment.

## C. Motion to Strike and for Sanctions

The plaintiff seeks to strike the government's motion for summary judgment and asks the Court to impose sanctions on the grounds that the government's arguments in support of the motion are not well-grounded in fact or warranted by existing law. He further argues that the defendants filed a 123–page memorandum of law (and attachments) in support of their motion "in an attempt to take advantage of the plaintiff's *pro se* status, to inappropriately supplement the Administrative Record in this cause, to mis-lead [sic] the Court, to circumvent the requirements of law, and to further their illegitimate goal to 'get the cut out.'"

The Court's discussion of the merits of this case demonstrates that the government's arguments in support of its motion for summary judgment were indeed well-grounded in fact and warranted by existing law. The Court similarly rejects the plaintiff's claim that the defendant's arguments were made to mislead the Court or to circumvent the requirements of law. In addition, based upon the complexity of the case and the volume of materials in the administrative record, the Court finds that the lengthy memorandum of law and supporting documents were warranted and were not intended to take advantage of the plaintiff's *pro se* status. In sum, the Court finds that the plaintiff's arguments in support of the motion to strike and for sanctions are without merit and the motion shall be **DENIED.**

## III. SUMMARY

For the foregoing reasons, the Court hereby **DENIES** the plaintiff's motion for summary judgment (Document No. 20) and **GRANTS** the government's motion for summary judgment (Document No. 23). Accordingly, the Court **DIRECTS** the Clerk of the Court to enter judgment in favor of the defendants and against the plaintiff.

The Court further **DENIES** the plaintiff's motion to strike and impose sanctions (Document No. 28) and **DENIES AS MOOT** the motion for a preliminary injunction (Document No. 30).

**IT IS SO ORDERED.**